GEORGE J. BAUMLER v. MRS. DOROTHY B. HAZELWOOD
ADMINISTRATRIX

No. A-8095. Decided May 31, 1961
Rehearing overruled June 28, 1961
(347 S. W. 2d Series 560)

*Blakely & Williams,* of Houston, for petitioner.

*Leachman, Gardere, Akin & Porter* and *Edward E. Crowell, Jr.,* all of Dallas, for respondent.

MR. JUSTICE GREENHILL delivered the opinion of the Court.

This is a damage suit arising out of a collision on Highway 77 north of Dallas in which Hazelwood was killed. Baumler brought the suit against the administratrix of Hazelwood's estate, and she brought a cross action against Baumler. The jury found Hazelwood guilty of negligence and Baumler guilty of contributory negligence. Judgment was entered that both parties take nothing. Only Baumler appealed. The judgment was affirmed by the Dallas Court of Civil Appeals, 339 S.W. 2d 75. The only question before us is whether there is any evidence to support the answers of the jury as to Baumler's contributory negligence; i.e., the jury findings that Baumler was traveling at a greater rate of speed than a person of ordinary prudence under the circumstances, and that his speed was a proximate cause of the accident. We find that there is no evidence to support the finding that Baumler's speed was a proximate cause.

The accident occurred about 1:30 a.m. on a Sunday morning. The night was clear and bright. There was a moon. The highway, U. S. Highway 77, was a concrete two-lane highway with a white line painted down the center and clearly visible. At the point of collision, the highway was smooth, straight, and level. There were gravel shoulders 6 or 8 feet wide leading into ditches on both sides of the highway. The highway runs north and south.

Baumler was driving north from Dallas in the east lane of the highway. Hazelwood, accompanied by a female companion, was driving in the opposite direction, i.e., south toward Dallas. Their cars collided, left-front fender to left-front fender. Hazelwood was killed almost instantly. The lady accompanying Hazelwood did not take the witness stand. While Baumler was permitted to testify about other matters, he was not permitted to testify as to the collision itself. The testimony was excluded by the trial judge because of the provisions of the Dead Man's Statute; i.e., that the accident was a "transaction with the deceased" under Article 3716, Vernon's Texas Civil Statutes Annotated. The correctness of this ruling is not before us.[1] There were no other eye witnesses, so the evidence before us consists mainly of the condition of the cars, condition and acts of the par-

---

1. Compare our recent decision in Harper v. Johnson, Tex. 345 S.W. 2d 277, holding under the circumstances, that an automobile collision was not a "transaction" within the meaning of the Dead Man's Statute.

ties before and after the collision, pictures taken at the scene, and the evidence left after the crash.

Since this is a "no evidence" case, the relevant testimony will be reviewed.

Baumler testified that he left a cafe in Dallas and proceeded out Highway 77 in his right-hand lane. He at no time got on the left-hand side of the road. He had recently been discharged from the Navy in good health and with 20-20 vision. He was driving a new car, a Ford purchased by him a few months before the accident. It had about 6000 miles on it. It was in perfect mechanical condition. The tires were good. As he drove north on Highway 77, he had his lights on, low beam. He testified that he had not been drinking, and there was no evidence that he had.

Mr. Roy Perry, Baumler's employer at the time of the collision, was telephoned when the accident occurred. He hurried to the scene and described it as follows: there was oil, water, glass, and chrome scattered 12 to 20 feet. There was debris on both sides of the highway. He placed the point of the impact at 2-1/2 to 3 feet on the east [Baumler's] side of the highway. There were scrapes of gouge marks in the highway made by "a bumper, spring or something" from Hazelwood's car. The gouge marks began 2 or 3 feet on the east [Baumler's] side of the highway, and continued across the west side to Hazelwood's car which was in the ditch some 40 or 50 feet from the point of impact. He found some tire marks "just before the impact." You could follow Baumler's tire marks from the point of collision to the place where it stopped in the ditch on the west side of the highway some 40 or 50 feet from the debris in the highway.

Vernon Mikel, ambulance driver, picked up Hazelwood and the lady with him. He testified that it was about 33 steps or 100 feet from the debris down to Hazelwood's car in the ditch.

Billy Gober was driving in the same direction as Baumler and came upon the scene shortly after the collision. He testified that there was dirt and glass on both sides of the centerline. He noticed drag marks or scrape marks on the highway made, perhaps, by a frame or metal object, evidently from Hazelwood's car, starting close to the debris, beginning 6 inches to a foot on the east [Baumler's] side of the highway and extending off at

an angle to the west. He testified that there were "about 15 or 20 feet" of skid marks in the east [Baumler's] lane, and there were some skid marks to the north in the west [Hazelwood's] lane. He didn't know how far, "they might have been 10 feet [long], something like that." He didn't remember the skid marks well. He just remembered marks on both sides of the highway. Both cars came to rest in the ditch on the west side.

George Thompson, who came on the scene after the collision, said that "there was debris along the east side of the road"; it was "between the middle of the east lane and the shoulder of the road." He didn't see any marks on the payment, no skid marks or scratches. He was not sure about the debris, but he remembered none on the west [Hazelwood's] side.

Baumler's Ford, which was in the ditch to the north of the point of collision and on the west side of the highway, was farther from the debris than Hazelwood's Dodge, which also came to rest in the west ditch to the south of the point of collision.

Patrolman Henry Campbell of the Dallas Sheriff's Department went to the scene immediately after getting a radio call. He testified that although there were lights of other cars, and although he looked diligently with his flashlight, he could find no skid marks for either car. He did find gouge marks on the pavement at the point of impact, but he did not measure them. He remembered the gouge marks as being on the west [Hazelwood's] side; but upon being shown photographs of the highway showing the marks, he could see that they were on both sides. He found glass and dirt on the highway. There was debris on both sides of the centerline. He regarded the center of the mass of glass as the point of impact. He thus established that the point of impact was "almost directly on the center stripe of the road; * * * most of the debris seemed to be on the west side of the highway toward where the cars had both gone into the ditch." He measured 66 steps from what he regarded as the point of impact to Baumler's Ford and 33 steps to Hazelwood's Dodge.

Gene Gauss, a professional free-lance photographer, had his car equipped with police radio-receiving equipment. He arrived at the scene within 10 minutes of the crash. His pictures were introduced in evidence. Some of them show the condition of the cars, both rather heavily damaged, particularly in the left-front

portions. Others show the highway shortly after the crash with people still standing around. These pictures show the gouge marks beginning a little on the east [Baumler's] side of the highway and curving at an angle off to the west and south. They show no skid marks. Gauss testified that his pictures show some marks, a gouge of some kind, beginning on the east side and going to the west side; that they were not tire marks.

Louis Booker also came on the scene soon after the collision. He said that there was glass all over both sides of the highway. He would not say which side of the highway had the most debris, and he could not say on which side the wreck happened. He had been traveling north, on the east [Baumler's] side, and he drove through glass on that side. He had run into a bumper or something on the west side. "We were sitting in glass when we stopped." He offered no evidence of skid marks or gouge marks. He noticed that the wiring on Baumler's car was on fire; so he cut the wires.

Maurine Frazier, Hazelwood's daughter, testified that Hazelwood's car was an old 1942 Dodge that would be "in a strain" at 40 miles per hour. When she had tried to rush her child to a doctor in it several months before the collision, it went on an average of 40 m.p.h. She would not swear how fast it could go; it would go over 40, but it would shake. She did not know the lady who was in the car with her father.

The defendant, Mrs. Hazelwood, testified that she and Hazelwood had been separated about 3 weeks at the time of the collision.

The jury found that Hazelwood failed to keep a proper lookout and failed to have his car under proper control, both of which were negligence and a proximate cause of the collision. It found that Hazelwood did not fail to turn his car to the right immediately before the collision; but it found that immediately prior to the collision, Hazelwood drove and operated his car so that a portion thereof extended to his lefthand side of the center stripe of the highway; and this was negligence and a proximate cause. Those findings are not attacked.

The jury found that Baumler did not fail to keep a proper lookout; did not fail to keep his car under proper control; and did not drive or operate his car on his left-hand side of the centerline. It found, however, that he was driving his car at

a greater rate of speed than a person of ordinary care and prudence would have driven under the circumstances; and that this was a proximate cause of the collision. It also found that Baumler failed to turn his car to the right immediately before the collision; and that this was negligence and a proximate cause.

The defendant Hazelwood moved that b o t h parties take nothing under the verdict of the jury. Baumler filed a motion to disregard the issues as to his speed and failure to turn to the right. His motion was overruled, and a take-nothing judgment was entered as to both parties.

■ Baumler's first two points in the Court of Civil Appeals were that the trial court erred (1) in submitting the issues to the jury on his failure to turn to the right, that he was traveling at an excessive speed, and that his speed was a proximate cause of the collision; and (2) having submitted the issues on turning and speed, the trial court erred in not disregarding the answers to the issues. For either of these points to have been sustained, the Court of Civil Appeals must have found "no evidence" to support the issues. That court sustained the points as to the turning issues and overruled them as to the speed issues. We therefore interpret the opinion as holding there was no evidence that Baumler failed to turn to the right or that Baumler was guilty of negligence in this regard. Neither party has assigned error in this Court on the turning issues. The Court of Civil Appeals held, however, that there was evidence to support the answers to the issues on Baumler's speed. As previously stated, Baumler's only points here are "no evidence" points on speed and its being a proximate cause of the collision.

■ The evidence on Baumler's speed is very weak. No witness testified how fast or slow he was going. Most of the witnesses, including the sheriff's patrolman, found no skid marks. Billy Gober conceded that he did not remember very well about the skid marks; but that they were about 15 or 20 feet on Baumler's side and about 10 feet on Hazelwood's side. The testimony as to the final position of the two cars varied widely. But assuming the greatest distance from the point of impact in support of the jury's verdict, Baumler's car came to rest some 66 steps and Hazelwood's car some 33 steps or 100 feet from the collision. But all the witnesses agreed that Baumler's head was smashed. His left eye was put out, and Hazelwood was killed. So there is no evidence of control of either of the cars, the ap-

plication of brakes or free movement, after the collision. The jury did not find that Baumler was exceeding the speed limit. Assuming Baumler was traveling 55 m.p.h. (the legal speed limit at night), there is no evidence that he, in good health with good eyesight, should have been traveling at a lesser rate of speed on the uncrowded, smooth, level, and straight paved highway on the clear, bright night in his new car with good tires. The Court of Civil Appeals found what it regarded as evidence of Baumler's excessive speed from the apparent force of the collision, the scattered debris, the condition of the cars, the injuries to the parties, and the testimony of Hazelwood's daughter which is capable of the construction that his old Dodge could not go much above 40 m.p.h. Assuming, without deciding, that this amounts to some evidence that Baumler was traveling at a greater rate of speed than a person of ordinary prudence would have traveled under the circumstances, we are of the opinion that there is no evidence that Baumler's speed, whatever it was, was a proximate cause of the collision.

"Proximate cause" was defined by the trial court in its change to the jury. Neither party complains of the definition given. In substance, proximate cause was defined as a cause, in a natural and continuous sequence, which produces an event and without which the event would not have occurred; and to be a proximate cause, it should be such as that it could have been reasonably anticipated and foreseen by a person of ordinary prudence that the event, or some similar event, would have results from such a cause as a natural and probable consequence.[2]

■ The definition embraces at least two distinct concepts, both of which must be present: (1) there must be cause in fact,— a cause which produces an event and without which the events would not have occurred; *and* (2) foreseeability. Even assuming, without deciding, that there is some evidence of foreseeability from speed itself under the circumstances, we find no evidence that Baumler's velocity in fact caused the accident.

---

2. The entire definition was as follows: "By the term "PROXIMATE CAUSE", as used in this Charge, means a cause which, in a natural and continuous sequence, unbroken by any new and independent cause, produces an event or occurrence and without which the event or occurrence would not have occurred; and, to be a proximate cause of an event it should be such as that it could have been reasonably anticipated and foreseen by a person of ordinary prudence in the exercise of ordinary care that the event, or some similar event, would have resulted from such cause as a natural and probable consequence, in the light of the attending circumstances. There may be more than one proximate cause of an event." Tr. 31.

As set out above, the jury found that Hazelwood drove his car over into Baumler's side of the road. It also found that Baumler did not drive on the wrong side of the road. But there is no evidence as to how far the two cars were apart when Hazelwood drove onto Baumler's side, and there was no direct evidence of the speed at which the cars were approaching each other. We find no evidence that, including reaction time, Baumler had any opportunity to take evasive action by turning, speeding up, or slowing down. The testimony regarding skid marks or the lack of them need not be repeated except to observe this: there were none according to the testimony of the sheriff's patrolman and other witnesses. There were tire marks "just before the point of impact" according to Roy Perry. And while Billy Gober said that he did not remember well, he recalled 15 or 20 feet of marks on the east and about 10 feet on the west. Gober did not describe the direction of the skid marks, except that they were on one side or the other of the highway. For that matter he did not testify who made the skid marks.

Under this evidence the jury would have to speculate on the time and distance factors. We find no evidence thereon. The jury found that Baumler kept a proper lookout and had his car under proper control. If, then, Hazelwood suddenly drove onto Baumler's side of the road and there was no time for Baumler to evade him, Baumler would have been hit, and he would have hit Hazelwood, at whatever speed Baumler was traveling.

The Texas authority nearest in point is *Biggers v. Continental Bus System* (1957), 157 Tex. 351, 303 S.W. 2d 359. That case reviewed this subject, the previous Texas cases, and the cases from other jurisdictions in the annotations in 77 A.L.R. 598, "Excessive speed of automobile as proximate cause of accident where it or colliding vehicle is on wrong side of road," and in 47 A.L.R. 2d 6, "Negligence of motorist colliding with vehicle approaching in wrong lane." The *Biggers* case held that speed of a vehicle in its proper lane could be a proximate cause of a collision with an approaching vehicle coming into its lane. It rejected the contention that excessive speed can never be a proximate cause of a collision occurring in the operator's own lane of traffic, with an automobile traveling in the opposite direction. But it did not hold that speed is always a proximate cause. It depends upon the facts.

In the *Biggers* case, the evidence showed that the car which got into the pathway of the bus got there at least 3-1/2 seconds before the collision. The Court determined that the car

and the bus were about 384 feet apart when Biggers' car got in the lane of the approaching bus. Under the circumstances the court held that the jury could find that the bus could have taken evasive action, and its speed was a factor in its failure or inability to do so.

In the original opinion of this Court in the *Biggers* case, 117 Tex. 351, at 367, 298 S.W. 2d 79, this Court said: "We think there can be no doubt that if the Ford crossed into the traffic lane in such a short time the bus driver could not put on his brakes, or slow his speed before the bus was on the Ford car, then the failure on the part of the bus driver to keep a proper lookout, to slow down, or apply the brakes could not possibly be a proximate cause of the collision." 298 S.W. 2d at 83. In the subsequent opinion in *Biggers,* the majority of the court said that if it could agree with the premise that the Ford "jumped" in front of the bus or entered the lane of the bus less than 2 seconds before the collision, it might find justification for setting aside the jury's finding. 303 S.W. 2d at 363. The majority in the *Biggers* case, however, found that there was competent evidence that the collision there did not happen like that.

We think the facts of this case come within the premise of the earlier opinion in the Biggers case and within the hypothetical situation described in the final opinion of the *Biggers* case.

Our holding is that there is no evidence that the speed of the Baumler's car was a proximate cause of the collision. The judgments of the courts below are therefore reversed and the cause is remanded to the trial court with directions to disregard the jury findings on Baumler's speed and turning and to enter judgment for the plaintiff Baumler in accordance with the remainder of the jury's verdict.