**TEXAS BRINE CORPORATION, et al., Appellants,**

v.

**Andrew K. LOFTON, Appellee.**

**No. C14–83–480–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

March 3, 1988.

Rehearing Denied May 5, 1988.

Roger D. Townsend, W. Wendell Hall, Houston, for appellants.

Gene S. Hagood, Alvin, for appellee.

Before JUNELL, MURPHY and SEARS, JJ.

## OPINION

SEARS, Justice.

Appellant, Morris Wayne Johnson, while in the course and scope of his employment with appellant, Texas Brine Corporation, was driving an eighteen wheel truck that collided with a pickup truck driven by appellee, Andrew K. Lofton. Lofton brought suit against the appellants for personal injuries sustained in the collision and the jury awarded him $113,500. The amount of recovery was reduced by 35%, which was the percentage of comparative negligence attributed to Lofton by the jury. This court reversed the judgment of the trial court. Lofton filed a writ of error with the Supreme Court and, in a per curiam opinion without oral argument, the Supreme Court reversed the judgment of this court[1] and held that this court failed to consider all the evidence before reversing the jury's verdict. In addition, the Supreme Court held that this court did not clearly detail how the evidence supporting the verdict was insufficient. *Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986).

A review of the history of this appeal is necessary. On original submission of this case, two opinions were issued by this court. The majority opinion held that the evidence was insufficient to support the jury finding that Johnson's speed was a proximate cause of the accident. The dissenting opinion held the evidence to be

---

1. *Texas Brine Corp. v. Lofton,* 698 S.W.2d 691 (Tex.App.—Houston [14th Dist.] 1985), *on second motion for rehearing,* 699 S.W.2d 391 (Tex. App.—Houston [14th Dist.] 1985).

sufficient. On motion for rehearing, three opinions were written by this court. One justice held there was no evidence to support the finding of speed as a proximate cause, one justice held there was insufficient evidence to support the jury finding that speed was a proximate cause, and the third justice again dissented and held the evidence was sufficient to support the jury finding. On second motion for rehearing, an additional opinion was issued by this court further substantiating the lack of evidence to support a finding of speed as a proximate cause. In other words, six opinions were written by three justices of this court prior to the filing of a writ of error in the Supreme Court. I therefore respectfully disagree with the Supreme Court's conclusion that, "it appears the court did not fully consider the evidence in determining the sufficiency points." However, we will again review all of the evidence that has any relevance to the issue of speed as a proximate cause of the collision.

At the time of the accident Johnson was traveling in the eastbound lane of FM 2917, a two lane road with a posted speed limit of fifty-five miles per hour. Prior to the accident, Lofton had been northbound on FM 2004, which dead ends at FM 2917. On the south side of FM 2917, several hundred feet before reaching FM 2004, there is a right turn lane for eastbound traffic. Immediately prior to the accident, Lofton's pick-up truck was in that right turn lane approximately 300 feet west of the intersection of FM 2917 and FM 2004, and he was facing west rather than east. In other words, Lofton was on the wrong side of the road and facing the wrong direction. As Johnson approached Lofton, Lofton drove his pick-up truck perpendicular to FM 2917 and in the direct path of Johnson's truck. Johnson's truck struck the left midsection of Lofton's truck and the force of the impact drove Lofton off the north side of the road.

## APPELLEE LOFTON

Lofton testified that prior to the accident he had been attending a welding class and, upon leaving the class at 7:30 p.m., he went to his parked pick-up and wiped off the windshield inside and out. He testified it was so foggy he could not see past the hood of his truck. He left the parking area and drove to the stop sign where FM 2004 dead ends into FM 2917. Lofton testified that he turned left and stated that his next memory was of being in the ambulance. His attorney asked him if he remembered which lane of traffic he was in at the point of impact and he responded that he did not. On cross-examination, Lofton was questioned regarding his prior deposition wherein he testified that he remembered getting in his truck and then waking up in the hospital, and that he did not remember anything in between.

## REX BUELLER

Mr. Bueller, an employee of appellant Texas Brine Corporation, testified that Johnson was driving the eighteen wheeler in the course and scope of his employment with Texas Brine Corporation. He further testified that the tractor Johnson was driving weighed approximately 16,000 pounds, the trailer approximately 10,000 pounds, and the load of brine approximately 45,000. He testified that the total weight of Johnson's vehicle was approximately 71,000 pounds and that the vehicle was licensed for 80,000 pounds.

## APPELLANT JOHNSON

Johnson testified that he was very familiar with the road and the configurations as he had traveled highway FM 2917 on many occasions. He testified that immediately prior to the accident the fog was very heavy. In his deposition he testified that, "he could not see his hand in front of the hood of the car." At trial Johnson testified that he was traveling approximately forty to forty-five miles per hour at the time of the collision and, in a deposition he testified that his speed was approximately forty-five to fifty miles per hour. He indicated that he really could not remember his speed, but that he knew it was less than fifty miles per hour. Johnson further testified that several cars had passed him traveling in the opposite direction and, that immediately

after one or more cars passed him, he saw Lofton's headlights on the right shoulder of the road facing in his direction. He testified that as soon as he saw Lofton's headlights, Lofton's pick-up pulled out on the highway in front of him. Johnson testified that he tried to turn his truck to the left and lock up his brakes at the same time, but that he *immediately* struck Lofton's truck. In response to questions regarding the distance between the trucks when Johnson first saw Lofton, Johnson testified, "I was right on top of him." Johnson had previously testified by deposition that the trucks were approximately six feet apart when he first saw Lofton. Later testimony of an accident reconstructionist established this distance to be 120 feet. Johnson testified that he cut his wheels to the left in an effort to "go with him." It was Johnson's belief that the impact would be less severe if he turned his truck in the same direction that Lofton's truck was traveling. Johnson further testified that immediately after the accident he exited his truck to check on Lofton, but that two or three other people were already there.

### JACK PETTIT

Jack Pettit was an officer for the Department of Public Safety with approximately twelve and one-half years experience as an accident investigator. He testified that he was notified of the accident at 7:55 p.m. and arrived at the scene of the accident at 8:22 p.m. Officer Pettit took no photographs and made no measurements of any of the physical evidence at the scene of the accident. He testified that there were no known witnesses other than the drivers, and that Johnson told him Lofton's truck swerved into his lane and Johnson tried to take action to avoid the collision but was unable to do so.

Officer Pettit talked with Lofton at the emergency room of the hospital shortly after his investigation at the scene of the accident. Lofton told Officer Pettit that he had no memory of anything related to the accident. Approximately two to three months later Officer Pettit again talked with Lofton and Lofton still had no recollection of any of the events leading up to

the accident. When questioned about the severity of the fog, Officer Pettit testified that it was patchy fog, heavier in some spots than others, and that at the time he arrived at the scene of the accident it was very heavy.

It is important to note that Officer Pettit testified that he did not take any measurements of the skid marks or any other physical evidence at the site of the accident. He testified that the Department of Public Safety only takes such measurements *when they are concerned about the speed of one of the vehicles involved in the accident.* Officer Pettit was cross-examined regarding his accident report and the fact that there was no mention of Johnson's speed in the report. Although Officer Pettit was qualified as an expert traffic investigator, the court refused to let him testify regarding his opinion as to the cause of the accident.

### RUIEBY HUNT

Mr. Hunt testified regarding the damage to the eighteen wheeler truck owned by appellant Texas Brine Corporation. He established that the cost of reasonable and necessary repairs was $12,258.17.

### RALPH CLARK

Mr. Clark testified that he was a friend of Lofton and his family, that he was on the highway the night of the accident and that it was a very foggy evening. However, on cross-examination it was established that he was on a different road some two hours prior to the accident.

### CHARLES RUBLE

Mr. Ruble testified that he had been with the San Antonio Police Department for many years and that for ten years he was captain and commander of the police academy. He was qualified as an expert accident investigator and analyst. Mr. Ruble was the only expert accident investigator or accident analyst to testify. Further, Mr. Ruble was the only person who took any measurements of the physical evidence at the scene of the accident. Mr. Ruble testi-

fied that he arrived at the scene six days after the accident. Based upon his investigation he prepared several scale drawings of the vehicles and the evolution of the collision. These drawings were introduced into evidence. Lofton also introduced some photographs into evidence. These photographs do not contradict the testimony or the drawings presented by Ruble.

Mr. Ruble testified that Johnson's skid marks were in his lane and were turning to the left. He also measured and identified Lofton's skid marks from the point of impact, sideways, to the point where they stopped and came to final rest in the ditch on the north side of the highway. Mr. Ruble testified that, based on all the physical evidence available and the weights of the vehicles, Johnson's speed at time of the impact was *forty-one miles per hour*. He testified that the vehicles traveled one hundred feet from point of initial impact to point of full rest. In an effort to calculate the distances and speeds, Mr. Ruble took into consideration the surface of the road, the coefficient of friction, the weights of the vehicles, the surface of the gravel/dirt bar ditch, the surface of the field and the total distance traveled before braking was initiated. From these measurements and calculations he then determined the speed at the time of impact. He testified that the point of impact was on the center line and that Lofton's car was sideways, or perpendicular to the roadway at time of impact. He further testified that Lofton's speed was approximately eighteen miles per hour at time of impact.

Mr. Ruble's testimony is extremely important in light of the per curiam opinion issued by the Supreme Court. The Supreme Court quoted a concurring opinion by Justice Sears, to wit: "Nothing could be clearer from the evidence than the fact that appellee jumped in front of appellant less than two seconds before the impact." The Supreme Court then held, "These statements are conclusory. In reviewing factual sufficiency points, the Court of Appeals is not called on to summarily disregard evidence or to substitute its judgment for the jury's. Rather, the Court of Appeals is called on to apply legal analysis to the evidence and avoid summary conclusions."

When the evidence presented at trial is thoroughly examined, in particular Mr. Ruble's testimony, it is undisputed that, "Lofton jumped in front of Johnson less than two seconds before impact." At page 419 of the statement of facts the following is a question posed to Mr. Ruble and his answer:

*Question:* Is there any way for you to tell—to give us your opinion concerning how much time Mr. Johnson actually had to react based on the speed of the vehicles prior to this impact?

*Answer:* Well, if we start with the raw minimum, 3–quarters of a second reaction [time], and a great many of the authorities and many of the cases have arbitrarily said, "We will accept an equal amount of time for perception," so, 3–quarters of a second perception, 3–quarter [sic] of a second reaction, *total one and a half seconds,* [sic] absolutely minimum, and if there's any kind of quandary or confusion during which some reasoning has to occur, of course, this is going to extend the time a little bit. I would say at least two seconds in this circumstance to first begin to perceive, and second, *to get anything going physically.* (Emphasis added.)

This particular question and answer followed a series of questions regarding the time lapse between the time Johnson first saw Lofton and the time the collision occurred. Mr. Ruble testified consistently that three-quarters of a second was required for the foot-brake reaction time, and three-quarters of a second for the perception or reasoning time. This court has previously taken judicial notice of the fact that three-quarters of a second is consumed by reaction time. *Thornton v. Campise,* 459 S.W.2d 455, 461 (Tex.Civ. App.Houston—[14th Dist.] 1970, writ ref'd n.r.e.).

Mr. Ruble went on to testify: "I would say at least two seconds in this circumstance to first begin to perceive and secondly to get anything going physically." However, Mr. Ruble then testified that

Johnson *was not able to get anything going physically.* He testified that there were no skid marks prior to the point of impact and, "Impact already happened before we had any braking set up." That is to say, Johnson did not have sufficient time to react *and* apply the brakes between the time he first saw Lofton and the time he collided with Lofton's pick-up. Mr. Ruble's testimony was clear, unequivocal and was not contradicted by any other testimony or physical evidence. Therefore, the evidence is irrefutable that Lofton jumped in front of Johnson less than two seconds before impact.

There was considerable testimony concerning distance traveled at the various speeds of the parties, and Ruble testified that it would have taken one-quarter of a second for Lofton to move from his stopped position at the side of the road to a position perpendicular to the road and seven feet into Johnson's lane of traffic. Based on Ruble's testimony and his speed calculations, Lofton was "sideways" in the path of Johnson's truck within one-quarter of a second to two seconds after he started moving his pick-up.

Ruble also testified that at 41 miles per hour, Johnson was travelling 60 feet per second. To calculate feet per second, Ruble used a formula of one and one-half times the miles per hour. Based on this calculation, Johnson was approximately 120 feet from Lofton when Lofton turned into Johnson's path. There was some discussion of that distance being 180 feet; however, this was in response to a hypothetical question based on Lofton approaching Johnson in the opposite direction or at an angle other than a ninety degree angle. Mr. Ruble testified the distance *could* be greater under other fact situations, but that under the facts of this case, based on a speed of 41 miles per hour, the distance was 120 feet.

■ During cross-examination by counsel for Lofton, Ruble testified that the left rear of Lofton's pick-up was five feet into Johnson's lane of traffic at the time of impact, and, that at his speed of 18–20 miles per hour he could have cleared John-

son's lane in as little as one-fourth of one second. (Seven feet was arbitrarily used for purposes of illustration). Another hypothetical was then posed to Ruble and he was asked if Johnson had reduced his speed one mile per hour for ten seconds prior to impact, thereby traveling fifteen feet less than the distance traveled at 41 miles per hour, would Johnson have missed Lofton. Ruble responded, "Certainly, drank one more cup of coffee at the terminal he would have been that much later too." Although this makes an interesting argument, it is not evidence that speed was a proximate cause of the accident. The forseeability element is still missing and the same analysis would be true if Johnson increased his speed one mile per hour or 100 miles per hour. To make this kind of suppositional leap, we must assume that all other factors remain constant. We cannot make such an assumption. So long as Lofton jumped in front of Johnson less than two seconds before impact, there is insufficient evidence to support a finding that a reduction in speed by Johnson would have prevented the collision. Johnson still would not have had sufficient time to take effective evasive action. Thus, there is insufficient evidence that Johnson's speed was a proximate cause of the accident.

In order to find that Johnson's speed was a proximate cause of the collision, there must be *evidence*, not speculation, that the accident would not have occurred "but for" that speed. There is *no evidence* that at a speed less than 41 miles per hour Johnson could have seen Lofton in *time* to have sufficient *space* within which to stop and avoid the collision. This time/space factor will be discussed in more detail in another section of this opinion.

Mr. Ruble testified that at a speed of 40 miles per hour, Johnson's truck would require 107 feet to stop *after* application of full braking power. Further, at 45 miles per hour this distance would be 131 feet. There is no evidence from any source of the distance required for the truck to stop at any speed less than 40 miles per hour. It would be pure speculation to assume that at some reduced speed Johnson would

have had sufficient time and/or space in which to stop his truck and avoid the collision.

### TIME/SPACE FACTOR

In the evolution of a collision between two masses, there is a point in time and space at which the collision becomes inevitable. When two masses are on a collision course they may travel inches, yards, miles or even hundreds of miles before they collide and, if no action is taken or forces applied to alter speed, direction or distance traveled, the collision becomes a physical and mathematical certainty. However, prior to any collision between two masses, there are points in time and in space at which speed, direction or distance traveled can be altered and the collision avoided. As the distance traveled increases, or alternatively the *space* between the masses or distance to point of impact decreases, the *time* within which forces can be applied to alter speed, direction or distance traveled also decreases. Further, the time before impact decreases proportionately with the speed at which the masses are traveling. If we recognize this law of physics and mathematics, we must further recognize and acknowledge that there arises in every potential collision between two masses a point in *time* where there is insufficient *space* between the masses in which to apply any forces that will alter speed, direction or distance traveled sufficiently to avoid the collision. This will be referred to as the "Time/Space Factor."

In this evolutionary process, forces can be applied to either of the two masses to avoid the collision by merely altering:

(1) *Speed*—The masses do not pass the point of impact simultaneously.

(2) *Direction*—One or both masses do not pass the point of impact at all.

(3) *Distance Traveled*—One or both masses stop short of the point of impact.

However, when the *time* before impact and the *space* between the masses is so diminished that an application of forces to alter speed, direction or distance traveled will not avoid the collision, we must recognize that the collision is unavoidable. Further, if one mass alters its speed, direction or distance traveled to *create* a point of impact that did not previously exist and, if this point of impact is created within the "envelope" of the time/space factor, then the speed of the second mass cannot be a proximate cause of the inevitable collision of the two masses. Regardless of the nature of the forces applied to the second mass along its long or short trip to the point of impact, *so long as the first mass creates a point of impact within the time/space envelope*, according to the laws of physics and mathematics the collision of the masses is inevitable. If we reject the time/space theory we must also find that speed is always a proximate cause of any collision. However, the Supreme Court has held that when one party suddenly drives into the other party's side of the road, and there is no time for the second party to take evasive action, the collision would occur at whatever speed the second party was driving. *Baumler v. Hazelwood*, 162 Tex. 361, 347 S.W.2d 560, 564 (1961).

### FOG

According to the testimony of all of the witnesses the fog was heavy prior to and at the time of the accident. Also, whether we rely on the accident reconstructionist's testimony that Johnson's truck was traveling forty-one miles per hour at the time of impact, or if we consider Johnson's testimony at the time of trial that he was traveling forty to forty-five miles per hour or his deposition testimony that he was driving forty-five to fifty miles per hour, Johnson was traveling at a speed less than the posted speed limit of fifty-five miles per hour. Therefore, Johnson's speed was not excessive unless we say it was excessive *because of the fog*. Following this line of reasoning, we must further find that "but for the fog" the accident would not have occurred.

In other words, in order to find Johnson's speed a proximate cause of the accident, we first must find that in the absence of the fog, Johnson would have seen Lofton at such a point in *time* that there was suffi-

cient *space* between the vehicles for Johnson to alter speed and thereby avoid the collision. To make that finding we must also find that, if Johnson saw Lofton when he was still one hundred, two hundred or three hundred feet away, Lofton's presence on the side of the road was so ominous as to put a reasonable person on notice that something bad was about to happen.

If this accident had occurred on a clear day and Johnson had seen Lofton's pick-up several hundred feet prior to the point of impact, Johnson would have had no lawful duty to reduce his speed to avoid the unforeseeable action of Lofton driving his vehicle perpendicular to the highway in front of Johnson's eighteen wheeler. Johnson was already traveling at a rate of speed which was five to fourteen miles per hour less than the posted speed limit. Appellee would have us *speculate* that if Johnson had reduced his speed just one mile per hour he would have avoided the accident. *There is no evidence to support such speculation.*

Lofton has no memory of the events leading up to the accident. Johnson testified that as soon as he saw Lofton's headlights, Lofton's truck pulled onto the highway in front of him and that he struck Lofton's truck *immediately.* Ruble testified that Lofton's truck entered the highway perpendicular to Johnson's lane of traffic less than two seconds prior to impact, and, that Johnson did not even have time to start braking his truck prior to impact. In fact, Ruble testified that full braking did not occur until the vehicles crossed the highway and entered the shoulder of the road. The jury found that Lofton failed to keep a proper look out and failed to yield the right of way. They further found that both acts were negligent and that both were proximate causes of the accident. These findings are not contested on appeal.

This is not a situation where Johnson's truck struck Lofton's pick-up head on or where Lofton was passing other cars and was in Johnson's lane and Johnson could not see him timely because of the fog. Nor is this a case where Lofton's truck was stalled in the highway or involved in some prior collision and was unable to move to get out of the path of Johnson's truck. There simply is no evidence that the fog prevented Johnson from timely seeing anything that would have alerted him to reduce his speed in order to avoid a collision or that such a reduction in speed would have prevented the collision. Mr. Ruble testified that the accident occurred as Mr. Johnson described it, and that it was impossible for Lofton to have been driving down the highway in a direction opposite to Johnson.

## PROXIMATE CAUSE

Proximate cause is comprised of two elements: (1) cause in fact, and (2) reasonable foreseeability. *Farley v. M.M. Cattle Company,* 529 S.W.2d 751, 755 (Tex.1975). "Cause in fact means that the act or omission was a substantial factor in bringing about the injury and without which no harm would have occurred." *Texas & Pacific Railway Company v. McCleery,* 418 S.W.2d 494, 497 (Tex.1967). The foreseeability element was established in *Clark v. Waggoner,* 452 S.W.2d 437 (Tex.1970) as:

> Proof that the actor as a person of ordinary intelligence and prudence should have anticipated the danger to others created by his negligent act, and the rule does not require that he anticipate just how injuries will grow out of that dangerous situation.... The test is not what the wrong doer believes would occur; it is whether he ought reasonably to have foreseen that the event in question, or some similar event, would occur. *Clark v. Waggoner,* 452 S.W.2d at 439, 440.

We hold that there is insufficient evidence to support a finding of either element of proximate cause. The driver of a vehicle whose speed is alleged to be a proximate cause of a collision should be found liable by reason of such speed only if the accident was reasonably foreseeable under the unique facts and circumstances of that case, *and* only if it could have been avoided but for the speed of the driver in question. When the collision in question was not rea-

sonably foreseeable, or, in the event it was reasonably foreseeable but could not have been avoided even if the defendant reduced his speed, then speed is not a proximate cause of the accident. *See Thornton v. Campise,* 459 S.W.2d 455 (Tex.Civ.App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.). Further, even if a driver is traveling at a greater rate of speed than a person of ordinary prudence would have traveled under the existing circumstances, that excessive speed is not necessarily a proximate cause of a subsequent collision. *Baumler v. Hazelwood,* 347 S.W.2d at 564.

In the much cited *Biggers* opinion, the Supreme Court held:

"[W]e think there can be no doubt that if the Ford crossed over into the traffic lane in such a short time the bus driver could not put on his brakes, or slow his speed before the bus was on the Ford car, then the failure on the part of the bus driver to keep a proper lookout, to slow down, or apply brakes could not possibly be a proximate cause of the collision." *Biggers v. Continental Bus System,* 157 Tex. 351, 298 S.W.2d 79, 83 (1957), *reversed* [157 Tex. 351,] 303 S.W. 2d 359 (Tex.1957).

In the subsequent *Biggers* opinion, the majority of the court said that if it could agree with the conclusion that the Ford "jumped" in front of the bus less than two seconds before the collision, it might find justification for setting aside the jury's findings. *Biggers v. Continental Bus System,* 157 Tex. 351, 303 S.W.2d 359, 363 (1957). *See also* Justice Griffin's dissent at page 370.

The Supreme Court has further held that where there is no evidence that a party has an opportunity to take evasive action by turning, speeding up or slowing down, there is no evidence that the person's speed, whatever it was, is a proximate cause of the collision. *Baumler v. Hazelwood,* 347 S.W.2d at 564. Consequently, after considering all of the evidence in this case at time of submission, on motion for rehearing, on second motion for rehearing and on remand from the Supreme Court, this court still finds there is insufficient evidence to support the jury's finding that Johnson's speed was a proximate cause of the accident. We therefore reverse the judgment of the trial court and remand for a new trial.

MURPHY, Justice, concurring.

For the reasons set forth in my opinion on Motion for Rehearing, I concur.

JUNELL, Justice, dissenting.

For the reasons set forth in my original dissenting opinion in this case, I still disagree with the opinion of the majority issued following remand from the supreme court. Therefore, I continue to respectfully dissent.